Our last case in the morning is case number 117096, the Illinois State Bar Association Mutual Insurance Company versus the Law Office of Tuzzolino and Terpinas. Are the parties ready to proceed? And I understand the Applees have split their argument and you understand it will be up to you to keep track of that. All right. Thank you. Proceed. Good morning, Your Honors. May it please the Court, Counsel, Robert Chemers for the plaintiff appellant, Illinois State Bar Association Mutual Insurance Company with Tim Eaton on the brief of appellant. Your Honors, this is an appeal from the Circuit Court of the County and the First District Appellate Court. The Circuit Court rescinded a policy, ISBA Mutual, issued to the law firm Tuzzolino and Terpinas. The appellate court reversed and reversed on some very unusual grounds that I won't get into. It is undisputed that ISBA Mutual, we refer to Illinois State Bar Association as ISBA Mutual Insurance Company, issued the policy in reliance on a material misrepresentation on the policy application. We're concerned with Section 154 of the Insurance Code which permits rescission of policies for that very reason. Will Terpinas claims to be innocent of that misrepresentation and maybe he is, but innocence is irrelevant to Section 154 because rescission under the statute doesn't depend on guilt. Section 154 of the Insurance Code codifies the equitable remedy of rescission of insurance policies for circumstances in which an agreement is based upon a material misstatement of fact. Even if innocently made and even if made by another person on the insurer's behalf, there is no turnabout for who made it and how it was made. The remedy is available because ISBA Mutual entered into a contract, it would not have entered, had it not been for the misrepresentation. Under Section 154 of the code, it does not matter that the misrepresentation was intentional or not, and it does not matter that Mr. Terpinas did not make it. This court held in Golden Rule v. Schwartz some 11 years ago in an opinion authored by Justice Freeman, that rescission does not depend on the insured making the misrepresentation or on anyone making the misrepresentation deliberately. The defendants do not even cite the Golden Rule case and let alone refute its holding. The defendants have a mantra throughout their brief that rescission is somehow a punishment or a penalty. Rescission is not a punishment or a penalty for intentional wrongdoing. It's an equitable remedy that releases a party from an agreement that was entered based on false pretense. Equity does not mean sympathy. And contrary to the defendants' argument that's throughout their review, equity holds no prejudice against insurance companies. We submit to the court on this record the equities favor ISBA Mutual, the insurance company. The company was deceived by the representations on the application that issue a policy of nonaddition. Whether Mr. Terpinas is at fault for that deception deliberately or not is irrelevant under Section 154 and this court's decision in Golden Rule. ISBA Mutual is certainly as innocent as Mr. Terpinas and less well-situated to know of the misrepresentation. Under Illinois law, for many, many years, an insurance company is entitled to rely on the application as submitted. It does not have to conduct its own investigation into the accuracy or veracity of the information on the application. The duty to complete the application truthfully lies with the applicant. Mr. Terpinas was in a better position to discover and prevent the fraud of his partner than ISBA Mutual. But in any event, guilt and innocence are irrelevant to rescission. The innocent-insured doctrine, discussed at great length by the appellate court here, has no relevance. This court has never spoken to the innocent-insured doctrine at all, and the appellate court has never applied it in a context other than policy exclusions until this case. And that's the only context where the doctrine makes any sense, where one's intentional acts are excluded and would otherwise threaten the coverage of other insurers who are innocent of those acts. Every Illinois case that has applied the innocent construction rule except this case looked at it from the standpoint of excluded intentional acts, including Economy Fire v. Warren, which the parties say is the touchstone of this so-called doctrine. And despite the defendant's insistence that the appellate court here called Warren or characterized Warren as a rescission case, not an insurance policy, at least the opening sentence of Warren's is somewhat unusual. It is not a very clear opinion. The word rescission appears once in the first sentence of the opinion, where it refers to Economy Fire, which you don't even know who Economy Fire is until you get to the second page of the opinion where they talk about Allstate, and you learn that Allstate was not the insurance company or the Warrens. Apparently what happened here is a policy was issued by Economy Fire, a homeowner's policy, to Rose and William Warren for a house on the south side of Chicago. The house burns down. Rose goes to Allstate, thinking that was their homeowner's carrier, and says, I lit a piece of scrap paper, threw it in the wastebasket, locked out the door, and burned down the house. Economy Fire had already paid a $20,000 payout to Rose and William for the loss of their home. They then apparently learned of the statement Rose gave to Allstate, thinking Allstate was their carrier. In fact, it wasn't. The action was brought to rescind the settlement. The defense to that was by William, I didn't do anything wrong. My wife burned the house down. I didn't. I am entitled to one half of the proceeds. The entire decision turned on policy language, and yet the first district didn't set forth the policy language. It was obviously the Intentional Act Exclusion, because the entire opinion focused on an Intentional Act Exclusion should not apply where one insured was innocent of the wrongdoing. Every case which followed, Warren, Wasik, Maselli, and Salemi, have all dealt with the same issue. They dealt with an Intentional Act Exclusion with multiple insureds, one of whom either committed arson or vandalism. Every one of them did not deal with an application for a policy or the rescission of a policy. They dealt with the Intentional Act Exclusion. The significance of that is recognized in Judge Bower's decision for the Seventh Circuit in Home Insurance v. Dunn. There the court correctly recognized the distinction between wrongdoing that invokes a policy exclusion and wrongdoing in the very procurement of the policy. Judge Bower looked at Section 154 and held for the Seventh Circuit, a falsehood on an application for insurance is fatal. Even though there were 12 other lawyers in that law, all of whom would have no coverage as a result of that decision. The appellate court here looked at Dunn and said, if Dunn was binding, paragraph 33 of its opinion, if Dunn was binding authority, it would likely defeat defendant's appeal. We submit it wouldn't likely defeat, it would unquestionably defeat the appeal. The court ruled that rescission here would require Dunn to prevail over Warren. The court misconstrued the two cases as being irreconcilable. We would submit to this court these cases are not at odds at all. They involve distinctly different factual circumstances. The court here decided that although it correctly recognized that the facts in Dunn were very similar to the facts here, the case was distinguishable for three reasons. The first is the obvious one. It's a federal decision, and it would only have persuasive authority, but certainly not binding authority, but the First District didn't even find it persuasive, except to say if it was Illinois law, it would likely defeat the defendant's appeal. The second one was that the Seventh Circuit relied on Ratcliffe, Ratcliffe versus International Surplus Lines Insurance, and the court said Ratcliffe didn't look to the innocent and assured doctrine. Well, no court did. No court in a rescission setting had looked to the innocent and assured doctrine. And then they scoffed at the reasoning by Judge Bauer that the policy was void ab initio rather than voidable. The bottom line is the policy was void. The case is actually on all fours with the situation we have here. Counsel, may I ask you a question? If you are correct that the misrepresentation of one partner defeats the malpractice policy for the entire firm and for the individual partners, what should those other partners do? How do other lawyers protect themselves in a large firm? How can lawyers protect themselves? Even the application itself said inquiry was made of other members of the firm. So you have the dishonest lawyer who signs the renewal application, asks the innocent lawyer, well, do you know of any claims? He says no. The guy who signs it knows of the claims. There would be no insurance coverage. It's the situation in Dunn. My question is, is there any way for the innocent lawyer to protect herself? Well, the firm should have some type of, you can call it loss management or risk management program that at the time of policy renewal, a memo was sent to every member of the firm basically to come forward. Are there any claims? Because if the claim was reported on a claims-made policy prior to policy renewal, the claim would be covered by the expiring policy. That wasn't done here. The person with knowledge of the claim didn't report the claim. So there was no coverage. We have a situation. Actually, there are three insureds here. There's the law office of Tuzolino and Turpinus. There's Mr. Turpinus. There's Mr. Tuzolino. Mr. Tuzolino didn't appeal. The law office of Tuzolino and Turpinus did not appeal. There's no question about that. They are not before this court. They were not before the appellate court. The appellate court recognized that at Paragraph 16, Note 1 of their opinion. We have a situation where who is before this court? The so-called innocent insured, Mr. Turpinus, and the malpractice plaintiff, Mr. Colletta. Interesting that they are before this court on the same brief because throughout the brief it is asserted by Mr. Colletta, arguably, that Mr. Turpinus did nothing wrong, but yet he's still been sued for malpractice. He's the linchpin to the policy. Mr. Towers, you included the clause in the policy so it should be construed in favor of the insured. Isn't that correct? There's a severability? There is a severability clause. There's an innocent insured clause. Yes, Your Honor. Right. So isn't the policy then really voidable because of the severability there? If the policy is void or voidable, the net result is the same. The policy would be rescinded based on the misrepresentation. The innocent insured clause is a notice clause. Even the appellate courts have that been applied. The severability clause would require this court to recognize that whereas here, like Justice Tice mentions, there are multiple insureds on a policy, there is a policy with each insured. If that were the case, this policy says they're all based on the application. The application was fraught with fraud. But this is a renewal. Is there a difference between a renewal and an original application? No. The net result is the same. In fact, under this statute, the net result is the same because the time limitation in the statute doesn't apply to this type of policy. It applies to a personal lines policy like auto, fire, or a homeowner's policy, not to a policy of professional liability insurance. And they make that argument. They didn't make it in the trial court. They didn't raise it in the appellate court, yet they have a couple of pages in their brief in this court about the one-year limitation provision, but the argument's a non-starter. It has no merit. The statute itself says it only applies to policies described in Section 143.13a, b, and c. A is auto policy, b is a fire policy, and c is a policy issued to a person or family. So this policy is not within that one-year limitation. We don't mandate malpractice coverage, but we do require that attorneys disclose that on their ARDC application with the purpose that's put on the website. So what about the public policy aspect of clients that rely on that information in hiring of counsel? The public policy, and that's interesting because Your Honor asked about plain reading of a statute during the first argument. Justice Thomas asked about it during the second argument. The statute here is very clear. There is no carve-out for who makes the misrepresentation or how the misrepresentation was made. But the statute, and that is the public policy. The defendants go at great length describing public policy. The public policy is well known to this court. It's based on the Constitution, statutes, and case law of this state. Section 154 is the public policy for the rescission of an insurance policy, and it sets forth that if the conditions of the statute are met, the carrier is entitled to rescind. But doesn't 154 say that misrepresentation has to be made in the negotiations for a policy? And that's what my question before was, this was a renewal. Yes. What's the difference then? The renewal is the initial policy is going to expire. The insured wants coverage. The insurance company is willing to renew, provided that the information it provides is suitable for the underwriting purpose of the risk to be assumed. The statute talks about both renewal and new issue policy. There's no question here this is a renewal policy. They had been an insured of ISJ Mutual for a couple of years prior to the renewal in 2008, which is the one we're talking about. The statute indicates that if its conditions are met, and I point out that we believe there's a right to rescission, a right to rescission if you comply with the statute, where the defendants say no. There is no right to rescission. Well, there's a First District case, ISBM Mutual versus Corregis, which held if you comply with the statute, the carrier is entitled to rescind. Here, all of the elements of the statute have been met. In fact, the defendants nowhere argue, nor does the appellate court identify. Any applicable requirement of Section 154 that was not satisfied by ISBM Mutual. The misrepresentation was in writing. It was on the application. It was either intentional or material or both. And it was made on behalf of the insured. Golden rule, this court's decision from 2003 refutes the argument that Section 154 must be construed to favor innocent insureds because there the court found rescission of a policy to be an available remedy even though the insured was innocent of the misrepresentation. The First District in its decision here had a comment after it attempted to distinguish Dunn and Warren that this court has consistently held that Section 154 is designed to protect insureds. We looked. We never found a case where this court ever held that. Justice Reyes, in the opinion for the First District, also held the Seventh Circuit so held and he cited the Karagannis case. That doesn't say that either. The entire application of the innocent insured doctrine to a rescission was improper. The innocent insured doctrine is unsuited to the remedy of rescission. It has only been used to enforce insurance policies when called upon to determine whether an intentional act exclusion applies. The defendants and the appellate court have obscured the distinction between rescinding a policy and enforcing an intentional act exclusion. We ask this court not to create a legal paradox. That would be conditioning the remedy of rescission on the provisions of the policy, Justice Burke, to be rescinded because that way the insurer becomes hostage to its own contract, which is what Judge Bower said should not occur. The defendants in Dunn pointed to the exclusion of waiver, waiver of exclusion provision, saying that if they didn't know about it, they weren't bound by it. But the court said you can't look at the policy provision. The policy is rescinded, and it doesn't matter if it's void ab initio or void as a result of the insurance company acting to rescind it. Mr. Chemers, does your argument begin and end with Section 154? Yes, Your Honor. And under 154, you need actual intent or not? You do not. You need only a misstatement of material fact that goes to the risk to be assumed. And what could be more material to a policy issued to a law firm and failure to disclose, forging signatures on settlement documents, lying to a court, lying to a client, and offering the claimant $670,000 to settle and then not pay it? And the bottom line of this is when you have a situation, as between ISP and Mutual and Mr. Turpinus, we submit we are as innocent as he is. That having been said, why should this court, why should any court, tolerate a policy of insurance procurement by fraud? Mr. Chemers, I have to say I'm not sure I've got the whole section of the statute because what I've got here is a relevant portion, but it looks like it's the second sentence that says no such misrepresentation of the warranty shall defeat or avoid the policy unless it shall have been made with actual intent to deceive or materially affect either the acceptance of the risk or the hazard assumed, et cetera. Right. So, yeah, okay. And we're not submitting that there was intent to deceive. I know. Just help me out here. So the material representation brings you to home plate is what you're saying, regardless of intent? Correct. Okay. And this court in Golden Rule said it doesn't matter. An innocent misrepresentation will void a policy, rescind the policy. For all those reasons, Your Honor, I'll save some time for my rebuttal. I would ask this court to reverse and affirm the circuit court. Thank you. Good morning, Your Honors. May I please report? My name is Jeffrey Thuck, and I represent Antonio Coletta in this case. Pure and simple, ladies and gentlemen, this is an attempt by a commercial insurance carrier to void a valid contract for professional liability insurance only after it receives notice of a claim. Anytime an insurance company seeks to exclude coverage, its right to do so must be clear and free from doubt. Contractual provisions which limit or exclude or statutory provisions which limit or exclude must be construed in favor of the insured and most strongly against the insurer. It's fair to say that the public policy of this state is defined for coverage on behalf of an insurer in the event there's a close call. Now, in front of the circuit court and in front of the appellate court, ISBA mutual argued home insurance versus Dunn, home insurance versus Dunn, home insurance versus Dunn. And Mr. Chemers is continuing to argue home insurance versus Dunn. The distinction that the appellate court made is an accurate depiction of the law in this state under the courageous case and under the American service case that is also contained. A policy is not void ab initio. It is merely voidable in a situation such as this. And that distinction is very, very important. Because if a contract is void ab initio, it's vaporized. It never existed. That's the legal fiction that's created. And under the circuit court's reasoning, because the contract never existed, because it was void ab initio, Wilter Penas, Jr. had no rights under that contract. Well, isn't that what rescission means? Not necessarily. Well, rescission is an equitable remedy. Okay? If it's void ab initio, that means the contract never existed. Judge, if the contract existed, you have equitable remedies that can be prosecuted. You have the innocent insured clause. You have the severability clause. All of those in the circuit court's view didn't exist. Because the contract didn't exist. Well, doesn't this go to contract formation? It does. It does. Now, the question is whether or not the innocent insured doctrine as to one insured, not all three insured, gives coverage to the innocent insured. And under that doctrine that the appellate court stated, there was a whole litany of cases that Mr. Chambers has gone through. I think the one that is most germane to this case is the Maselli case versus State Farm. What ISBA Mutual is saying is that Sam Tussolino committed fraud. And because Sam Tussolino committed fraud, we are entitled to rescind this insurance coverage. In Maselli, State Farm brought a declaratory judgment action to void an insurance policy. And the reason State Farm brought that action is because it had a clause in its contract that says concealment of fraud. And that clause says the entire policy shall be void if any insured intentionally concealed or misrepresented any material fact or circumstance relating to the insurance. In the Maselli case, you had mom and dad that owned a house. Mom and dad were insured. Three children were insured. One of the children in the Maselli case thought it would be a good idea to commit insurance fraud and trashed the house. They lied about that to State Farm when they investigated the claim. And the court found that that particular insured is not entitled to coverage. But mom and dad were in Alcapulco when this happened. They were entitled to coverage because they were innocent insurers. What's the difference? Is there a difference between coverage and contract formation? No, because this is a contract for liability insurance. Help me figure that out. I mean, there's a difference between, as you just described, coverage, who is going to be covered under the policy versus whether a contract was formed at all. Because State Farm in the Maselli case argued that the entire contract should be void. They argued the same thing. Everyone agrees there was a valid contract for insurance with State Farm. Right. And the issue was who is going to be covered. No. The issue is whether the policy would be void, with all due respect. And that is what is going on here. We have a valid contract of insurance. It is not void ab initio. Home versus done doesn't apply in this case. So can you talk in the language of contract formation? Sure. The contract, when it was formed, as to Will Turpinus, Jr. Not as to Sam Tussolino. Not as to the law offices of Tussolino and Turpinus. Will Turpinus, Jr. made absolutely no misrepresentations when this contract was formed. None. He made no representations at all. There is no question that Will Turpinus, Jr. knew nothing about what his partner was doing. It is not maybe he was innocent. Not apparently he was innocent. He was innocent. Is that, I mean, keeping with the theme of the day here, many days here, the wording of the statute is important, isn't it? It is. And it says, or materially affects either the acceptance of the risk or the hazard assumed by the company. So my question, it seems a little tortured to say that when the policy was made that had nothing to do with your client. It seems, at least from the language of the statute, that the purpose of the relevant language from Section 154 is to allow insurance companies to avoid risk that they have not fairly contracted. And that's why I think you hear questions regarding the formation of the contract. I understand that. But the language of that statute does not give an insurance company a right to rescission. It simply does not. And this court and counsel indicated we didn't cite golden rule. We did cite golden rule. And this court described Section 154 as, We note that Section 154 is representative of statutes which are designed to relieve against rigorous consequences of common law rules as to warranties and misrepresentations concerning insurance. Well, what does it mean then when it says no such misrepresentation or false warranties shall defeat or avoid the policy unless? It means that an insurance carrier is limited in seeking remedies of rescission and is limited by this policy. This court has said that over and over again. Right. Okay. And I don't know that Mr. Chemers would disagree with that, what you had just said. But the unless goes on to say unless there's actual intent. Right. Which, on behalf of Wilmer, wasn't it? And he agrees that what the second half that Justice Kilbride brought up, or materially affects either the acceptance. And their position is the factual misrepresentation affected their acceptance of the risk. If they had known that, they would not have entered. I understand that. But the acceptance. What does the statute give them a right to do? Rescind as to Tussolino and rescind as to Tussolino and Terpenes LLC, but not against the third individual insured, Will Terpenes, Jr., because he made no misrepresentations. He didn't. He had a. . . So under Justice Tice's hypothetical with Mr. Chemers. Yes. That 400-person law firm, the person who signs the policy under these circumstances, is out. The 399 are in. If they had no knowledge of what he was doing and they made no misrepresentations, yeah, they should be. Yes, they should be covered. So that's quite a bit of risk, right, for that area? It sure is. And then we get back to what ISBA Mutual is arguing is the status quo. And Mr. Chemers mentioned that. What is the status quo? This misrepresentation was made by Sam Tussolino on April 29th. The policy expired on May 1st. Had Mr. Tussolino told the truth and checked yes instead of checking no on that box, on a bill, by the way. It's an invoice. It's not an application. If he would have checked yes on that box, ISBA Mutual would have had notice of this claim. Wilter Penas, Jr. would have been covered. If in a rescission case, and that's what this is, this is not a statutory right to void insurance coverage. This is a common law equitable rescission case. Under my stolen hypothetical from justice, and it's a question probably better reserved for Mr. Chemers when he's back up here, that 400-person law firm were one out of the 400 maybe on the hook for not providing coverage for material misrepresentation. What does that do to premiums? They should know, honestly. This is not something that is an isolated instance. They, obviously, they're in insurance care. They have actuarial research. Every once in a while they're going to get a bad apple. They shouldn't be allowed to just walk away from the good apples because there's one bad apple. And, again, this is a severable contract that Mr. Cano is going to address. But the last point, the status quo here, the status quo is Wilter Penas, Jr. has coverage under the prior policy. And in a rescission case, you've got to get both parties back to the status quo, not just one. They just want ISBA mutual to be returned to the status quo as though this policy didn't exist. So they would have had to get a, they should get an affirmation or application from every member of the 400-person law firm. Sure, but I don't think, again, I doubt very seriously ISBA mutual insurance 400-person law firm. In a case where you've got two guys, yeah, they should make them each sign it. And I honestly, Your Honor, I can tell you. Would you have a different outcome here if Mr. Terpenas had signed this application? No, because Mr. Terpenas, under the words of this application, would have been telling the truth. So he had, I mean, if you take a look at the exact. So Tuzzolino would have been covered? Maybe, maybe not. I mean, there could have been other exclusions from the coverage. But had Terpenas signed this application under that, to my knowledge, is what it says, I know of nothing, it would have been absolutely true at that point. But again, they want the status quo. They don't want the status quo for Will Terpenas, Jr. So what does this thing about we affirm that after inquiry of all members of the firm, the aforementioned information is true, and so forth? If Will Terpenas, Jr. would have signed that, we wouldn't be here. I'm going to yield to Mr. Cano about the severability and the partial decision. Okay. Good morning, Your Honors. May it please the Court, Counsel, Chris Cano on behalf of Defendant Eppley Will Terpenas, Jr., the innocent insured in this case. I am going to address the severability clause, but I think that ties into a very important issue that Justice Tice and Justice Thomas picked up on. How should lawyers protect themselves in this set of circumstances? I don't know the answer to that with respect to a 400-member law firm because we don't know how that law firm is organized, whether they're a corporation or LLC or otherwise. But what we are presented with here, under the facts and circumstances, is a two-person law firm organized as a limited liability company under Rule 722. They must have insurance coverage. And as the Court is fully aware, ISBA is trying to rescind the policy as to my client, Will Terpenas, Jr. If you look at the policy itself, there is a severability clause, which the court, the appellate court, picked up on and was the second reason for overturning the trial court decision in this case. What the appellate court said was, based upon that severability clause, there's actually three separate policies of insurance and one applicable to the innocent insured in this case. So this provision that is drafted by ISBA and put into the policy, this is a way to protect lawyers. If there are severable contracts or severable policies of insurance, the bad apples are not covered, but the good apples would still have coverage. Picking up further on the issue that Justice Thomas raised, and I'll use the 400-person law firm, in that set of circumstances, no doubt an insurance carrier would put something else into the policy, expressly imputing knowledge or the misrepresentation on an application to all members of that law firm. That's not in this policy. There is nothing in here, and there's nothing cited by ISBA, to suggest that there's any basis in the contract to impute the misrepresentation to my client. The record is clear that Mr. Terpenes had no knowledge, no participation, no actual or constructive knowledge of the circumstances that led to misrepresentation. Excuse me. What about the language that Chief Justice Garmon referred to that says, I'm paraphrasing, after inquiry? What about that after inquiry clause? Doesn't that open the door to knowledge? Well, it would open the door to knowledge, but let's look at this circumstances. Will Terpenes, if he was the signing partner here on the renewal invoice, if he goes down to Sam Tuzolino's office, the bad apple in this case, and asks him, are you aware of any set of circumstances, I don't think anybody in this room would think that Sam Tuzolino would say, oh, yes, by the way, I committed all these fraudulent transactions and potential malpractice. That's never going to happen. The only way that that would happen is if Terpenes was in Tuzolino's head or had some other way of knowing what was going on here. But he didn't. And like I said, the record is clear. They can't even argue that he had any sort of knowledge of this. But when you look at the severability clause, as it's drafted, it says the application is made a part of the policy. So if you look at the question four and the signatory, and this was kind of addressed towards the tail end of Mr. Thutt's argument, those representations were true as to my client because he had no knowledge of any claims. So if you sever the policy to Sam Tuzolino, the law office of Tuzolino and Terpenes and Will Terpenes, that representation would not be inaccurate. He was not aware of anything that would cause a claim. And there's just simply no evidence on this record. And, again, going back to what I said earlier, ISBA as the drafter of this contract could have easily avoided the situation, and there's cases that are discussed in the briefs, and I won't belabor the point here, where there is expressed language imputing misrepresentations by one as to all. There is nothing in this policy to suggest that misrepresentation by Sam Tuzolino would be imputed as to Will Terpenes or that the policy would be voided or rescinded in a case such as this. So on this record, I would submit to the court that the defendant appellees respectfully request that the appellate court decision be affirmed on all basis. How does the factual nature play into this? The whole Coletta, your client did nothing wrong, it's still against Tuzolino. How do the facts play into this whole situation? You briefly mentioned that, Mr. Chairman. Well, I think ISBA wants to apply 154 on a one-size-fits-all sort of circumstance, but the facts and circumstances definitely do come into play. I mean, in this case, two-person law firm, one bad actor, one good actor. There's no way that Mr. Terpenes had any knowledge, actual or constructive, of what was going on between Mr. Tuzolino and his representations of the underlying malpractice plaintiff, Coletta. And that's what I'm suggesting here. When the question was posed, how do lawyers protect themselves? Well, in this case, the lawyers are protected because that's what the policy says. No doubt, if the court affirms the appellate court, I would expect that insurance companies would then modify their language to put express language in there, imputing misrepresentations to all. We've seen that time and time again, that the insurance industry does adapt. But in this set of circumstances where the underlying malpractice and misrepresentation was not known by the innocent insured, and given the policy language before the court with the severability clause, at best it creates three separate contracts. At worst, it's an ambiguity that should be liberally construed in favor of insurance coverage for the innocent insured. Would Tuzolino benefit as a result of your approach in this case? No, Tuzolino would not benefit. As far as I know, he's been disbarred, and I don't know that he has any assets or has filed bankruptcy. I'm not aware of his circumstances, but it would certainly impact my client because if ISBA is successful in rescinding this policy, he's exposed to not only this, but who knows if there's other situations of malpractice involving Sam Tuzolino's actions. We don't know that, but he would definitely be exposed. And as I said earlier, Rule 722 allows lawyers to form firms as limited liability companies if they have insurance coverage. That's what they did here, and that's the reasonable expectation of Will Terpenes here. If there's no further questions, I again respectfully request that the appellate court decision be affirmed in all respects. Thank you for your time. Your Honors, with respect to rebuttal, this will be similar to the lightning round on Family Feud. It will go quickly. There are a lot of questions. Chief Justice, you asked would the outcome be the same if Mr. Terpenes signed the renewal application. The answer is unmistakably yes, and it would be because the statute doesn't have a carve-out for who made the misrepresentation or whether it was innocent. This court in Golden Rule had an opportunity, Justice Tice, if there was any merit to the argument that the innocent-insured doctrine applies to policy formation. It applies to the applicability of an exclusion. This court in Golden Rule had the benefit of the Economy Fire versus Warrant case for almost 15 years. It didn't look at it. It looked at an innocent representation made on an application for insurance by one who was not even the insured, and it held the policy was subject to rescission because it was a misstatement of material fact. So there's no doubt the result would be the same because it would still fail to disclose what the insured knew. The concept of the liberal construction and policy interpretation, that goes to whether there's a duty to defend. We're not considering that. Those rules don't apply. There's no rule of liberal construction. We're not looking at a policy. We're looking at a statute, and the statute doesn't have a carve-out. The statute is very clear, and there is a significant difference between policy formation and the applicability of an exclusion. And contrary to what you heard about status quo, the status quo was returned. That is to say, whatever benefit ISB Neutral received, it gave back. That's all it has to do under the law. And Sergeant Lundy is a case where that's all the insurer had to do to perfect rescission, and that this is a bill and not an application. There's an old saying, if it quacks, it's a duck, no matter what you call it. You can call it a goat, you can call it a chicken, but if it quacks, it's a duck. This says renewal, quote, invoice, and acceptance form. It refers to an applicant, and it refers to acceptance of this application. It sets forth the information one would certainly anticipate on a renewal application. It sets forth the policy limits available, the deductible, and the cost. And then it asks questions. The underwriter's testimony, Bonnie Hill, was unrebutted, and the trial court so held it, page 6 of the transcript. It was unrebutted. She said, this is a benefit we give our insureds who have been with us for a couple of years, no claim history, and are seeking less than $3 million in limits. They don't have to answer an 8-page, 35-question application. They've been on the books. We would submit to the court that the status quo has been returned, there is a renewal application, that there's no merit to the severability clause because the separate contracts, if you will, are all tied into the fraudulent application. And we would suggest that if the court were to look at any case outside Illinois, and that's other than Dunn, which is a Seventh Circuit case, but the First District relies on a New Hampshire Supreme Court case, which is no less non-binding than the Seventh Circuit decision in Holm v. Dunn. The dissent in that case by Justice Lovecchia is very telling, where he indicates that I am loath to join a result that could be perceived as tolerating fraudulent procurement of insurance. And this was a four- or five-lawyer law firm, and they like cherry-picking. Who was innocent and who wasn't? So, in effect, you'd have to ask, who knew what and when? And that's not how policy formation works. Policy formation is based on the submission to the insurer that does its underwriting. You heard about actuarial analyses. Insurance companies don't have an actuarial function with respect to lying on an application. They have an actuarial function with respect to risk, and the risk to be obtained in connection with the premium charge. Again, the idea of materiality to the risk, as Justice Thomas inquired, a 400-lawyer law firm, it is inconceivable that it would come to the insurance industry having to send a renewal application to every member of the law firm. Then you'd wonder, do you only ask partners? Do you ignore the associates? They're all members of the law firm in the sense that any one of them could be a defendant in a malpractice claim. The fact is, a person in a position of trust signs the application. Here, it was signed by Sam Tuzolino, owner-slash-partner. Obviously, a person in a position of trust because Mr. Terpenes put him in that position, and he spoke on Mr. Terpenes' behalf and on behalf of the law firm. We would submit to the court that the absurdity of having a policy procured by fraud is something this court should not tolerate. The Fourth District permitted that. We cited the case of Standard Mutual v. Jones. That's a case where the auto insurer asked on an application for a new policy to identify all persons who are resident dependents, licensed or not, and mom and dad, husband and wife, forgot they had a 16-year-old and an 18-year-old son. The 18-year-old had been in two accidents. The 16-year-old just got his license. Policy is issued. Policy is renewed. Three days later, the 16-year-old is in an accident, totals the parent's car, damages someone else's car, injures four people. The insurance company then learns about the 16-year-old on the policy for the very first time after the accident. But Illinois law permits post-claim underwriting. You don't have to ask questions about the information on an application. What happened here? Rescission was sought, but it wasn't permitted because the policy had been in effect for one year. So having been in effect for one year in an auto policy, the bar of 154 applied. So although policy was procured by unmistakable fraud, it was okay because the insurance company didn't find out about it within one year. Therefore, it didn't matter. So if you're going to lie to the insurance company on an auto, homeowners, or prior and extended coverage policy, lie and keep your fingers crossed that you don't get found out in one year. Because, in effect, for the paltry premium for that auto policy, two total vehicles were paid for, four bodily injury claims were paid for, on a policy that should never have been issued because of some unmistakable to people lie. That should not be tolerated. And it should not be tolerated whereas here, there's a so-called innocent insured because that concept, until this case in the appellate court, has never been applied to policy formation. And we ask this court not to do so. We ask this court to reject that doctrine as it applies to policy formation and leave it where it belongs with respect to policy interpretation as to an intentional act. This court had the opportunity, I dare say, 11 years ago in Golden Rule, to apply Warren. It didn't. Warren's not discussed. That defendant in Warren was as innocent as ISBA here. The policy was rescinded. I should say as innocent as Will Trepinas is here. It was rescinded. We would ask this court for that same result. Affirm the circuit court. Reverse the appellate court. Unless there are any questions, I'll sit down. It didn't appear there were any questions. Thank you, counsel. Case number 117096, Illinois State Bar Association Mutual Insurance Company v. The Law Office of Tuzolino and Trepinas, is taken under advisement as agenda number 11. Mr. Chambers and Mr. Foote and Mr. Vito, thank you for your arguments today. You're excused at this time. Marshal, the Supreme Court stands adjourned until 9.30 tomorrow morning.